In the Matter of **IMPERIAL "400" NA-TIONAL, INC.,** et al., Debtors, **Joseph M. Nolan,** Appellant in No. 72-1566.

**Joseph M. NOLAN,** Appellant in No. 72-1920,

v.

The **JUDICIAL COUNCIL OF the THIRD CIRCUIT.**

Nos. 72-1566, 72-1920.

United States Court of Appeals, Third Circuit.

Argued Jan. 16, 1973.

Decided April 23, 1973.

Rehearing Denied May 23, 1973.*

Submitted to Court En Banc May 25, 1973.

Rehearing En Banc Denied June 11, 1973.

Certiorari Denied Oct. 9, 1973. See 94 S.Ct. 68, 71.

Martin L. Haines, Dimon, Haines & Bunting, Mount Holly, N. J., for appellant.

* For opinion denying rehearing see 486 F.2d 297.

Morton Hollander, Leonard Schaitman, Civil Division-Appellate Section, Dept. of Justice, Washington, D. C., for appellee in No. 72–1920.

Laurence W. Levine, Walsh & Levine, New York City, for appellee Union Bank.

Before LUMBARD *, ALDRICH° and SMITH *, Senior Circuit Judges.

## OPINION OF THE COURT

ALDRICH, Senior Circuit Judge.

■ These consolidated appeals from two proceedings in the New Jersey District Court present a single issue, the propriety, viewed in the circumstances under which it was adopted, of a resolution of the Judicial Council of the Third Circuit (Council), dated February 10, 1972, which provides as follows:

"RESOLVED that in all bankruptcy proceedings this Council holds as incompatible the continued representation as attorney for the trustee by any lawyer or his firm who represents a third party who submits a plan for reorganization in the bankruptcy; and that recusal by the attorney only from commenting on proposed reorganization plans is not an adequate immunization from the appearance of a conflict of interest."

On May 2, 1972 the district court, pursuant to this resolution, removed appellant, Joseph M. Nolan, Esq., as counsel for the trustee in reorganization of Imperial "400" National, Inc. Nolan appealed that order and also brought a petition of mandamus, or declaratory judgment, against the Council. The district court[1] dismissed the mandamus action, July 29, 1972, agreeing with the Council that Nolan had an adequate remedy by way of appeal to this court, and that the district court was without jurisdiction. D.

C., 346 F.Supp. 500. We, too, agree, and Nolan's appeal from that dismissal must fail. We must, however, address ourselves to our dissenting brother Lumbard's claim that we lack jurisdiction of the appeal from the original removal order. Since jurisdiction is always open it is, of course, not determinative that in the mandamus proceeding the Council itself took the position that we would have jurisdiction. We believe, however, that the Council—and the district court —were correct.

■ On this we see no real issue. We are not reviewing the action of the Court of Appeals, but, directly, of the district court. Admittedly we are reviewing indirectly the action of the Council, but the dissent's assertion that we have no power to do this is just that. The circuit council, while composed of judges, is an administrative body, and not a court. Chandler v. Judicial Council, 1970, 398 U.S. 74, 86 n. 7, 90 S.Ct. 1648, 26 L.Ed.2d 100. Reviewing the district court's May 2 order, which drew its substance from the Council's resolution, seems in no material respect different from reviewing a similar district court order which drew its substance from statutory provisions such as 11 U. S.C. §§ 557, 558. The latter task is our statutory duty under 11 U.S.C. § 47. At least in a situation where there is a district court order capable of being reviewed, we see no reason, in the absence of any statutory provision, why the Council's actions are untouchable except by the Supreme Court, and we greatly doubt that that Court so thought when it declined to permit the filing of a petition for mandamus. Nolan v. Judicial Council of the Third Circuit of the United States, 1972, 409 U.S. 822, 93 S.Ct. 111, 34 L.Ed.2d 154. On this assumption we pass to the merits after, necessarily, a complex statement of the facts.[2]

---

* Of the Second Circuit, sitting by designation.

° Of the First Circuit, sitting by designation.

1. Senior Judge Roszel C. Thomsen of the District of Maryland, sitting by designation.

2. Still further facts may be found in the thorough opinion of the district court in the mandamus action, 346 F.Supp. 500.

## THE APPEARANCE OF CONFLICT OF INTEREST

Appellant, Joseph M. Nolan, Esq., an experienced member of the bankruptcy bar, was appointed in February, 1966, as counsel for the trustee in reorganization of Imperial "400" National, Inc., a chain of motels doing business in thirty-five states. The trustee successfully continued the operation of the business, but acceptable plans for reorganization did not materialize. Two plans, although allegedly favored by many creditors, were opposed by the trustee through Nolan as his counsel.[3] On April 14, 1971, orally, and April 19 in writing, Nolan advised the district judge in charge of the reorganization, Hon. Robert Shaw, now deceased, that a client of his law firm, Schiavone Construction Company, was interested in filing a plan. Judge Shaw replied on April 21 by a letter, with copies to all creditors:

"If a good plan of reorganization which is more fair, equitable and feasible than any heretofore submitted may be available by participation of Schiavone Construction Co., I do not think stockholders, creditors and other parties in interest should be deprived of the benefit of such plan by reason of the fact that Mr. Nolan represents that corporation in other matters."

He went on to state that the trustee himself had no conflict of interest, and was a well-qualified attorney capable of representing himself with respect to reorganization plans, and that accordingly he was ordering Nolan to "refrain completely from any participation therein," but to continue to represent the trustee in all other matters.

"If it is felt by any interested party that this is not the appropriate way to proceed to gain the financing of Schiavone Construction Co., the Court will entertain and consider objections which, if any, should be promptly presented."

We will not pause to consider the oversolicitude, if any, the court exhibited towards the trustee's counsel vis-a-vis the estate. In any event, no one objected, and two affirmatively assented—Union Bank of Los Angeles, a large creditor, hereinafter Union Bank, and the SEC. The SEC wrote that because it felt "the estate should not be deprived of the possible benefits arising from Schiavone's participation" it had no objection to the proposed procedure; the bank concurred, with a similar statement. Thereafter New York counsel appeared for Schiavone, and Nolan continued to represent the trustee in a substantial amount of day-to-day legal work unconnected with reorganization plans.

## THE CLIMATE

### *Pre-Schiavone*

Thus no conflict of interest of a disqualifying nature was perceived, at least to the point of accepting the court's open invitation to speak up. We lay particular emphasis upon this not only because of its general significance, but because well before that date matters had not been going to everyone's satisfaction, and the parties had become engaged in recriminations on a markedly personal level. Union Bank was represented by one Laurence W. Levine, Esq., who was also chairman of the creditors' committee. His vigorous attacks on the trustee and his counsel in connection with their requests for interim fees, of which there were several, were characterized by the district judge at one point as "allegations of lack of integrity and suggestions that there is deliberate mismanagement of the estate." Nor did Nolan fail to respond in kind. The Court of Appeals had found one of the district court's fee allowances substantially excessive,[4] and doubtless the con-

---

3. Since delay in the approval of a plan of reorganization bears on the case, we note that the trustee's opposition to these plans was shared by the SEC, which found them infeasible and unfair. CCH Bankruptcy Law Reports ¶ 64,496.

4. In the Matter of Imperial "400" National, Inc., 3 Cir., 1970, 432 F.2d 232.

troversy was exacerbated when the district court, on receipt of the mandate, on March 10, 1971 excused the trustee from paying interest on the amount obliged to be refunded, but not Nolan. Nolan appealed, and the creditors cross-appealed.

### Post-Schiavone

In April, 1971, Nolan's new, in the sense of more limited, position was approved. Nothing occurred thereafter to cause the discovery that there was an impermissible appearance of a conflict of interest, except a continuation of personal differences. In the appeal taken from the district court's failure to assess interest, which Levine used as a vehicle to suggest Nolan's removal, ante, Levine filed an affidavit in 137 paragraphs attacking Nolan, and Nolan, in reply referred, inter alia, to "Levine's flow of nonsensical and scandalous statements." One of Levine's charges totally irrelevant to the question of interest on the refund was that Nolan had sued Union Bank for eight million dollars in order to induce the bank to drop its support of another plan and to favor Schiavone's. Ultimately the district court's fee decision was reversed again.[5]

The Court of Appeals did not enter into these controversies between the parties more than it could help.[6] However, in its 1970 opinion, the court spoke of "the friction which apparently exists," and "suggest[ed] that the trustee and his counsel make a greater effort to work with the creditors and other interested persons in an effort to terminate this lengthy reorganization proceeding with dispatch. . . . The main business of the trustee and his attorney at this point should be to press forward to an acceptable plan of reorganization, not to concentrate on their 'personal interests.'" 432 F.2d at 240–241 n. 28, 29. Again, in the 1972 opinion, the court referred to the "widespread dissatisfaction with the failure of the . . . fidu-

ciaries to secure action by the court on a reorganization plan." 456 F.2d at 931.

### COUNCIL ACTION

On January 22, 1972, five days before the interest-on-fee-refund case was to be argued to a panel, Levine addressed a letter to the court, stating that while there was no motion filed to remove the trustee and his counsel, and while he did not wish time for oral argument on that subject, he felt the court "could exercise its equity power" to remove the trustee and his counsel, "which we hope it will and of its own volition." It does not appear what transpired at the argument, but thereafter two members of the panel, who had also been members of the previous panel, wrote a letter to the Chief Judge of the circuit. This letter is substantially quoted in the opinion of the district court, 346 F.Supp. 504–505. In substance it suggested that the Chief Judge "should at least suggest to the assigned district judge or Chief Judge Augelli that such counsel should withdraw as counsel for the trustee." The letter stated that even though Nolan was no longer advising with respect to reorganization plans, he did advise the trustee on all other matters, and that the public was unlikely to understand such action, particularly in view of the litigation over fees. "The fact that Schiavone Co. has New York counsel to represent them on the plan will not overcome, in the minds of laymen, the continuing representation of this company in all other matters by the Nolan . . . firm."

The factual accuracy of the letter is disputed by Nolan. The letter stated that the trustee was favoring the Schiavone plan, "even though a plan favored by many of the creditors had been submitted many months before the Schiavone plan and gives them cash, which is what they want." While one of the alternative plans did provide cash, the cash element was apparently inserted by amendment after the Schiavone plan was

---

5. In re Imperial "400" National, Inc., 3 Cir. 1972, 456 F.2d 926.

6. The court did note on one occasion that the "briefs contain considerable material

irrelevant to the issues presented by these appeals," 456 F.2d at 931–932, n. 15, a very modest description.

filed.[7] Further interstices in the Council's knowledge will be touched upon later. However, the thrust of the letter was not to attempt to resolve the issues between the parties, but to eliminate them by summarily removing counsel, thus avoiding the "danger of adverse publicity affecting the entire federal bankruptcy system."

On February 10 the court, meeting as the Council, unanimously, except for two judges not voting, adopted the resolution in question. A month later the Chief Judge wrote to Judge Shaw, paraphrasing the resolution in general, rather than in its narrow terms, and suggesting that Nolan be given the opportunity to resign. The letter concluded,

> "I realize that this will be of real concern to you but I know you realize that some of the appeals in this case have caused much concern to the judges hearing them."[8]  346 F.Supp. at 515.

Judge Shaw replied that Nolan was unwilling to resign because he, and the Judge, felt it would be acknowledging a fault which was not recognized, and that they both felt that if there were to be a removal it should be for cause, as to which "Mr. Nolan insists . . . he is entitled to an evidentiary hearing." In further correspondence, in which the resolution was explicitly set forth, the Chief Judge continued "to emphasize that [the] resolution is directed at the *appearance* of a conflict of interest. . . . We are talking policy." Since cause was not asserted, he repeated, there was nothing personal, and no hearing was called for.

Nolan continued to disagree. Ultimately this discussion was obliged to come to a halt, and with a detailed protest that he should not have been required to do so, Judge Shaw on May 2 terminated Nolan's retainer. Attempts to obtain an interim stay pending appeal failed,[9] and ultimately the present panel of senior circuit judges from outside the circuit [10] was designated by the Chief Justice.

## THE POWERS OF THE COUNCIL

■ 28 U.S.C. § 332 provides as follows,

> "Each judicial council shall make all necessary orders for the effective and expeditious administration of the business of the courts within its circuit. The district judges shall promptly carry into effect all orders of the judicial council."

Appellant contends that "this statute, as written and as employed is unconstitutional." As to the first, his brief is singularly unpersuasive. It cannot be unconstitutional to authorize the courts to manage their own business. It is doubtless true, as the Court pointed out in Chandler v. Judicial Council of the Tenth Circuit, 1970, 398 U.S. 74, 85 n. 6, 90 S.Ct. 1648, 1654, 26 L.Ed.2d 100, that the statute "is not a model of clarity in terms of the scope of judicial councils' powers," but we believe this lack merely raises issues of construction. As to this innumerable authorities with diverse qualifications have asserted that the phrase "effective and expeditious administration of the business of the courts" is to be broadly construed. *See* Brennan, The Continuing Education of the Judiciary in Improved Procedures, 28 F.R.D. 42, 43 (1962); Burger, The Courts on Trial, 22 F.R.D. 71, 74–77

---

7. We think the inaccuracy in this respect attributable to a misunderstanding by the judges of an earlier letter from counsel which we find in the record.

8. The dissent's suggestion that it was "altogether likely that [in the month prior to this letter] attempts were made informally to secure Judge Shaw's compliance" is, to us, contra-indicated by this language and further language quoted from the letter in n. 13, post, and finds no support in the record's extensive report of interchanges.

9. *See* 346 F.Supp. at 507.

10. We note that two members, as former chief judges, headed their own councils for 11 and 8 years, respectively. The panel took immediate steps to expedite the hearing of the appeal.

(1958); Hearings on H.R. 2973, H.R. 5999 Before the House Comm. on the Judiciary, 76th Cong., 1st Sess., 22 (1939) (remarks of Judge John J. Parker); Fish, The Circuit Councils: Rusty Hinges of Federal Judicial Administration, 37 U.Chi.L.Rev. 203, 206 (1970). The reasons seem clear. The individual district judge has his own docket to consider, and his own problems. There must be a body with a broader horizon, and a broader responsibility, to oversee the district court as a whole, not just in regard to day-to-day operations and internal problems, but in the larger perspective of the court's place in the body politic.

Nowhere has the present aspect of that duty been better expressed than in a Report of the Judicial Conference of the United States at its June, 1961 meeting on the Powers and Responsibilities of the Judicial Councils, presented to the House Committee on the Judiciary by the Honorable Emanuel Celler, Chairman, 87 Cong., 1st Sess., H.D. 201. Included in the Conference's conclusions is the following,

> "(2) The responsibility of the councils 'for the effective and expeditious administration of the business of the courts within its circuit' extends not merely to the business of the courts in its technical sense (judicial administration), such as the handling and dispatching of cases, but also to the business of the judiciary in its institutional sense (administration of justice), such as the avoiding of any stigma, disrepute, or other element of loss of public esteem and confidence in respect to the court system, from the actions of a judge or other person attached to the courts."

We note in this connection that Chairman Celler stated in his Foreword,

> "Since I, at the time [that section 332 of Title 28 was enacted] was a mem-

ber of the Committee on the Judiciary of the House, I know it was the intention of the Congress to charge the judicial councils of the circuits with the responsibility for doing all and whatever was necessary of an administrative character to maintain efficiency and public confidence in the administration of justice."

We have no question but that there is included in this area the important matter of conflict of interests.

█ Nor do we accept appellant's contention that a judicial council lacks rule-making power. His argument that this would destroy uniformity flies in the face of the fact that every court of appeals, not to mention many district courts, has its own local rules. The caveat is that such rules must not conflict with rules that have been made effective *nationally*. *See* In re Mandell, 2 Cir. 1934, 69 F.2d 830. If a court of appeals may make rules for itself, we see no reason why a judicial council, sitting as an administrative body, cannot, short of exercising traditional judicial functions, *see* post, enact appropriate rules, or resolutions, applicable to all courts within its circuit. *See, e. g.*, United States ex rel. Frizer v. McMann, 2 Cir., 1971, 437 F.2d 1312, 1317 (issuance of rules covering prompt disposition of criminal cases). This, however, does not answer the present question.

## THE RESOLUTION IN CONTEXT

In spite of the foregoing, we are deeply troubled by what occurred in the present case. The fact that the resolution worked individual hardship to appellant is not determinative. Rules, and the maintaining of public relations, *cf.* Barr v. Mateo, 1959, 360 U.S. 564, 574, 79 S.Ct. 1335, 3 L.Ed.2d 1434 may often work individual hardship.[11] Nor is it necessarily determinative that the resolution was occasioned by a particular

---

11. As a small example, we note the recent case of Lipman v. Massachusetts, 1 Cir., 1973, 475 F.2d 565, which involved a state court denying a court reporter the customary opportunity to profit by selling copies of transcripts to the public.

situation. General rules must often be made in response to some event that calls attention to their need. The difficulty here is that the Council was not alerted to any general need. Although not so couched, the resolution was not only triggered by, but tailored to, a case quite apparently unique. The SEC, which has statutory supervision of Chapter X reorganizations, 11 U.S.C. § 608, informs us through its Solicitor that it has never heard of a case other than the one at bar that would come within this resolution. Nor have we been able to discover one. The action accordingly comes uncomfortably close, perhaps too close, to a function denied to the Council, the exercise of "traditional judicial powers." Chandler v. Judicial Council, 398 U.S. 86 n. 7, 90 S.Ct. 1648.

What particularly troubles us in these circumstances is that some members of the body adopting this, in effect, in personam resolution had been exposed to highly defamatory accusations against appellant, had been themselves "much concern[ed] by appeals", and had expressed by no means insignificant criticisms. Moreover, the only information presented to the Council as a whole was, in its factual aspects, both inaccurate and incomplete. Viewed from the standpoint of appellant, it must be thought ironic that at, or at least following, the suggestion of his antagonist, he should be condemned unheard by a body whose very excuse for acting was the necessity of maintaining public confidence in the fairness of the courts. The explanation that he was not being discharged for cause, but only for the appearance of a conflict of interest, could be less than satisfying, especially so since in the year between Judge Shaw's letter to the creditors and the Council's action it was only the substantive attack on Nolan, and not the conflict of interest situation, that had changed. Even when the decision was unquestionably for appearances only, and the atmosphere was entirely devoid of personal criticism, a far cry from the present case, such assurances are not always found convincing. See dissenting opinions in Rapp v. Van Dusen, 3 Cir., 1965, 350 F.2d 806.

The circuit council is a valuable arm of the courts, and nothing we say in this opinion should be taken as denigrating its great importance. But like any administrator we believe its success may be measured by its lack of visibility. We suspect that some who have criticized councils for inactivity are unmindful of the saw that still waters run deep, and that the most effective actions are often the most inconspicuous. But, conversely, we think nothing would furnish potential critics of the circuit council with ammunition more than would overaction. As one member of the present panel has wisely stated, "Those who comprise the councils must do the work by example, leadership, and persuasion. The making of orders and their publication should be the last resort, rather than the first." Lumbard, The Place of the Federal Judicial Councils in the Administration of Justice, 47 A.B.A.J. 169 (1961).

THE APPROPRIATE PROCEDURE

■■ If an order was necessary, the circumstances demanded procedural protection for Nolan. As the Court stated in Goldberg v. Kelly, 1970, 397 U.S. 254, 262–263, 90 S.Ct. 1011, 1018, 25 L.Ed. 287, appropriate procedural protection depends on the nature of the injury to the grievant and whether the latter's interest in avoiding the injury "outweighs the governmental interest in summary adjudication." The consequences to appellant—not to mention the estate—were drastic, particularly in the light of the atmosphere of charges of misconduct. Moreover, summary action by the Council was manifestly unnecessary. There was no need of a rule; Nolan (or, quite possibly, Levine), was the problem. There was no reason, even timewise, as the chronology makes clear, why there could not have been a hearing. Indeed, we suggest that summary action in the circumstances of this case, rather than serving any important gov-

ernmental interest, constituted an inadvertent disservice to the concept of circuit councils. While this was not as serious as a disbarment, *cf.* In re Ruffalo, 1968, 390 U.S. 544, 88 S.Ct. 1222, 20 L. Ed.2d 117, and Nolan did not have, perhaps, the equivalent of tenure, *cf.* Perry v. Sindermann, 1972, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570, we note Mr. Justice Harlan's statement, concurring in Chandler v. Judicial Council, ante, 398 U.S. at 127, 90 S.Ct. at 1676.

"There is much in our tradition of due process of law that runs counter to the taking of serious action on the basis of *ex parte* assertions or suspicions of misbehavior." [12]

We would be more moved by the dissent's assertion that the "Circuit Council was in the best position to determine what measures should be taken" if it had followed that advice.

We might also feel differently if the resolution was an inevitable truism, as the dissent apparently suggests. But while we agree with the dissent's general discussion of conflict of interests, we feel that the issue as it relates to bankruptcy proceedings is a good deal more complex. There is no doubt but that the limitations imposed by Judge Shaw upon Nolan's retainer did not, in fact, eliminate all appearances of a possible conflict of interest. Indeed, we regard Nolan himself as so conceding during oral argument. The SEC fully conceded it,

but stated it had accepted the situation after a "balancing of several considerations." In brief, the SEC believed that the conflict of interest problem was outweighed by the potential delay in the proceedings caused by removal of an officer who, over a period of five years, had accumulated substantial familiarity with the estate. The Council's action was taken without knowledge of this position of the SEC.[13]

The SEC's pragmatic stance was consistent with the bankruptcy law; complete disinterestedness is not required in all aspects of bankruptcy proceedings. *Cf.* In re Eloise Curtis, Inc., 2 Cir., 1964, 326 F.2d 698. For example, 11 U.S.C. § 557, which provides that the attorney for the trustee must ordinarily be disinterested, contains a proviso, "that for any specified purposes other than to represent a trustee in conducting the proceeding under this chapter the trustee may, with the approval of the judge, employ an attorney who is not disinterested." [14] The present case could be thought to be an unusual, but nevertheless, permissible application of this statute: Nolan was employed for the special purpose of conducting the very complicated day-to-day operations of the estate, short of the plan of reorganization, with which he had become experienced and proficient.

We do not affirmatively adopt this position; we point it out merely to show

12. The dissent's suggestion that Nolan might have asked for reconsideration by the Council, we regard as unrealistic. It is true that he could have asked. In the light, however, of the detailed response, ante, to Judge Shaw's letter protesting Nolan's removal without a hearing, we cannot think that a further request, however put, would have been productive.

13. We do not find that the Council was even aware of the extent that the district judge in charge of the reorganization had conferred with the creditors. In his original letter to him, the Chief Judge referred to "your actual or tacit approval," a phrase we would think inconsistent with such knowledge. Instead, as the dissent significantly re-

marks, it was "aware that on two occasions creditors had objected that the district judge had been overgenerous to the trustee and his counsel regarding fees."

14. *Compare* 11 U.S.C. § 72(c): "An attorney shall not be disqualified to act as attorney for a receiver or trustee merely by reason of his representation of a general creditor." Section 72(c), primarily a general bankruptcy provision, applies to reorganization proceedings, but is modified in that context by section 557 and section 558. *See* Dodd, The Securities & Exchange Commission's Reform Program for Bankruptcy Reorganizations, 38 Colum.L.Rev. 223, 230–31 (1938). *Cf.* 11 U.S.C. § 556.

that the Council's resolution was not the only valid perception. Not only did the district court feel differently, but so, apparently, did every creditor when the issue was first presented. While we agree with Union Bank that it should not be "estopped" by its initial acquiescence in the court's proposal, we cannot disregard its evidentiary effect. And, finally, we must give especial weight to the SEC, an impartial body experienced in these matters.

Again we do not mean that the SEC was right, or not right. But given this situation, the Council could easily have suggested a district court hearing on the issue of appellant's continued service, the hearing to include the sort of balancing adopted by the SEC. *Cf.* In re Pittsburgh Rys. Co., W.D.Pa., 1948, 80 F.Supp. 14.[15] A district court could have made a determination on a full record with, if desired, appellate review, and this would have solved the problem consistently with the interests of the parties and the Council's purpose of protecting the integrity of the court system.

■ We remand the case to the district court for a hearing as to whether, viewed as of the present, Nolan should be re-engaged as counsel for the trustee. Since substantial time has passed since his removal, the district court should weigh the conflict of interest problem as it now stands against the beneficial—or harmful—effects of reengaging appellant at this point in the reorganization. At such hearing, if they so desire, creditors may also raise the question whether matters had reached a point where appellant because of his conduct or the appearance of a conflict of interest, or both, should have been removed for cause. Appellant has no right to recover for loss of any fees which he might have earned, regardless of how it came about that his retainer was terminated.

In No. 72–1920 the order of the district court is affirmed. In No. 72–1566 the matter is remanded to the district court for further proceedings consistent with this opinion. No statutory costs in No. 72–1920, but appellant shall recover all costs in No. 72–1566, including the cost of his entire consolidated brief and appendix, to be charged against Union Bank.

LUMBARD, Circuit Judge (dissenting):

I dissent. The appeal from Judge Shaw's order should be affirmed. As to the appeal from the district court's dismissal of Nolan's petition for writ of mandamus, I would affirm because in my opinion a district court is powerless to entertain a petition to mandamus the circuit council.[1]

---

15. If, in the light of *Chandler*, it could be thought not a forbidden in personam judicial decision, the Council could have conducted a hearing itself, *Cf.* In re *Rodebaugh*, 1950, 10 F.R.D. 207. The Council did conduct a hearing in *Chandler*.

1. With all respect to the circuit judges of the Third Circuit, I suggest that the active circuit judges should not have recused themselves from hearing these appeals; instead, they should have sat as the Court of Appeals en banc. Thus the same judges making the order under attack would have heard the appeal. They could have held a hearing forthwith, or not, as they decided. The judges would be sitting in a dual capacity—as a court of appeals sitting en banc and as the circuit council. The business of supervising the district

courts and their officers is for the active circuit judges of the circuit. When they order something to be done, in the exercise of their section 332 powers, it is their duty to see that it is done, whether on appeal or by review of the denial of a petition for mandamus. In any event, such action ought not to be viewed as a cause of disqualification, even though those affected by the order ask for it.

It is to be hoped that the action of the circuit judges of the Third Circuit in recusing themselves will not be followed by other circuits. Nothing could be more destructive of supervisory authority than to have cases such as this passed upon by circuit judges from another circuit. Subject only to corrective action by the Supreme Court, circuit council action should be followed by

In making his order of May 2, 1972, which terminated the services of Joseph M. Nolan as attorney for the trustee, Judge Shaw carried out the following resolution of the Judicial Council of the Third Circuit:

"RESOLVED that in all bankruptcy proceedings this Council holds as incompatible the continued representation as attorney for the trustee by any lawyer or his firm who represents a third party who submits a plan for reorganization in the bankruptcy; and that recusal by the attorney only from commenting on proposed reorganization plans is not an adequate immunization from the appearance of a conflict of interest."

This resolution of the circuit council was binding on all the district courts of the circuit and on all the officers of those district courts, which included counsel for trustees in reorganization proceedings, such as Joseph M. Nolan. The order of the council was and is the law of the circuit.

Admittedly the circuit council order of February 10, 1972, was intended to apply to appellant Nolan. It is undisputed that there was pending and under consideration by the district court, the trustee, and the creditors, an offer for reorganization of the debtor corporation made by Schiavone Construction Company, which, since November, 1965, had been a client of the law firm of Nolan & Lynes, of which Nolan was the senior partner. It follows that Nolan could no longer continue to serve as counsel to the trustee. Consequently, we should affirm Judge Shaw's order of May 2, 1972.

No district judge or panel of the Court of Appeals for the Third Circuit, no matter how constituted, has the power to question the action of the Judicial Council of the Third Circuit. The circuit judges of the Third Circuit have spoken, in accordance with powers conferred on them acting as a circuit council. It would be altogether incongruous for any lower court or single panel of judges in the Court of Appeals for the Third Circuit to pass upon whether what the council has done is a lawful and proper exercise of the council's powers. There is no statutory authority or precedent for such review.

Appellant's only recourse was a petition to the circuit council to review its action or a petition for mandamus to the Supreme Court. Although the majority opinion in Chandler v. Judicial Council of the Tenth Circuit, 398 U.S. 74, 90 S. Ct. 1648, 26 L.Ed.2d 100 (1970), which is the only Supreme Court case that has considered the power of the circuit councils thus far, did not reach the question of whether the Supreme Court had jurisdiction to issue a writ of mandamus to a circuit council, Justice Harlan, in a separate concurrence, found that the Supreme Court had jurisdiction under the All Writs Act, 28 U.S.C. § 1651, to entertain petitions for mandamus. Justices Black and Douglas, though dissenting from the majority's disposition of the case, agreed with Justice Harlan that the Supreme Court had jurisdiction.[2]

At the same time, on the merits, I am convinced that the action of the circuit council was well within its powers and that the appellant has no basis for complaining that in directing the termination of his services he was deprived of due process of law.

The order of the circuit council was an entirely proper exercise of its powers under 28 U.S.C. § 332 to supervise the conduct of business in the district courts

speedy compliance, as the statute contemplates; it should not be permitted to spawn litigation and delay beyond what the circuit council may determine to allow.

2. It must be noted, however, that on October 11, 1972, the Supreme Court denied without opinion appellant's petition for leave to file a Writ of Prohibition and/or Mandamus directed against the Judicial Council of the Third Circuit. 409 U.S. 822, 93 S.Ct. 111, 34 L.Ed.2d 154 (1972).

and the manner in which officers of the court should conduct themselves so that public confidence in the impartiality of the courts and their officers should not be impaired. As was conceded at oral argument, the continuance of Nolan as counsel to the trustee while there was pending for consideration a plan of reorganization suggested by a client of Nolan's firm presented the appearance of a conflict of interest. It seems clear to me, as it did to the circuit council, that the appearance of impropriety could not be cured by an announcement that Nolan would not advise regarding the offer of his client; the appearance of a conflict would persist so long as he continued in daily service to the trustee.

The circuit council was in the best position to determine what measures should be taken to offset the obvious stigma which would have tainted the proceedings if Nolan had continued as counsel. The power to make orders was given to the circuit councils precisely because they are in the best position to decide what corrective steps should be taken when such situations are brought to their attention. Here several members of the court had recently been alerted to the situation because they had heard appeals from orders of Judge Shaw in the same proceeding, 432 F.2d 232 (1970) and 456 F.2d 926 (1972).

We must look to the circumstances surrounding the enactment of § 332 and the operation of the circuit councils in the performance of their supervisory powers since 1939 in order properly to evaluate the order of the Third Circuit council. I think such an inquiry demonstrates that the councils were intended to exercise the broadest powers with respect to supervising the administration and conduct of the district courts, including district judges and officers of the court, in order to promote efficiency and proscribe any activity which might impair public confidence in the proper and impartial administration of justice. Moreover, it was intended that the councils should use these powers in whatever

manner seemed best calculated to deal with particular situations.

Until 1939 there was no means of supervising the administration of the district courts, or the activities of district judges or officers of the district courts, apart from determining questions raised in litigated cases. By then the need for more immediate and constant control had become clear. Chief Justice Hughes voiced the feeling of the Supreme Court that such power should not be centralized in that Court. He said to the Judicial Conference in September, 1938:

"Instead of centering immediately and directly the whole responsibility for efficiency upon the Chief Justice and the Supreme Court, I think there ought to be a mechanism through which there would be a concentration of responsibility in the various circuits—immediate responsibility for the work of the courts in the circuits, with power and authority to make the supervision all that is necessary to induce competence in the work of all of the judges of the various districts within the circuit.

Now we have had in the States considerable effort in this direction through the appointment of judicial councils. * * * My thought is that in each circuit there should be an *organization which will have direct and immediate responsibility with regard to the judicial work in that circuit.* [Emphasis supplied.]

My suggestion for your consideration is that there should be in each circuit a judicial council. * * *

* * * * * *

When you come to the supervision of the work of the judges, * * * there you have the great advantage of the supervision of that work by the men who know. The circuit judges know the work of the district judges by their records that they are constantly examining, while the Supreme Court gets only an occasional one. And the circuit judges know the judges personally in their districts;

they know their capacities. And if complaints are made, they have immediate resort to the means of ascertaining their validity. That direct supervision can be made very effective, and I think far more so than the remote supervision, entailing a great deal of labor and circumlocution, imposed upon the Chief Justice."

Judicial Conference of the United States, Report on the Powers and Responsibilities of the Judicial Councils, H.R.Doc. No. 201, 87th Cong., 1st Sess. 3 (1961).

Thus was born the idea of making the circuit councils the vital centers for supervision and corrective action. A committee of the Conference then collaborated in the preparation of legislation, which was passed after hearings before congressional committees at which testimony was given by members of the Judicial Conference, notably Chief Judge Groner and Chief Judge Parker. Judge Groner said:

"Under the present judicial setup we have no authority to require a district judge to speed up his work or to admonish him that he is not bearing the full and fair burden that he is expected to bear, or to take action as to any other matter which is the subject of criticism, *or properly could be made the subject of criticism, for which he may be responsible* . . . [emphasis supplied.]"

H.R.Doc. No. 201, *supra* at 5.

Before the House Judiciary Committee Judge Parker gave the following testimony, which is quite revealing on the question of what power the circuit councils were intended to have:

"JUDGE PARKER. This (council) can deal with all sorts of questions that arise in the administration of justice.

MR. CELLER. Do you put any restraint on the council at all?

JUDGE PARKER. I do not think this bill does. Of course, I assume this is true: That the councils will be restrained by the inherent limitations of the situation. They would know that, if they commanded a judge to do something, unnecessarily or unwisely, he would refuse to do it, and that would probably be the end of the matter."

H.R.Doc. No. 201, *supra* at 5.

The Judicial Conference draft became law in August, 1939. The relevant part of § 332, as it has read since a 1948 rearrangement which made no substantial change, provides as follows:

"Each judicial council shall make all necessary orders for the effective and expeditious administration of the business of the courts within its circuit. The district judges shall promptly carry into effect all orders of the circuit council."

In recent years the circuit councils have been frequently criticized because they have not made greater use of their powers. The appearance of inactivity has arisen largely because much of the supervision by the councils has been accomplished informally and not by written or published order; it has been done by telephone or private interview. In almost every case the fact that the circuit council had the power to make orders has rendered it unnecessary to do so in a formal way. A suggestion from the chief judge or one of the circuit judges almost always has gained ready compliance. Rarely have the councils found it necessary to enter a formal order. Even more rarely has any order been published. And until this case arose, Chandler v. Judicial Council of the Tenth Circuit, decided by the Supreme Court in 1970, 398 U.S. 74, 90 S. Ct. 1648, 26 L.Ed.2d 100, was the only reported case wherein action by a circuit council had been questioned.

Meanwhile, questions concerning the operation and powers of the circuit councils have been frequently considered by the Judicial Conference and its committees. In March, 1961, the Judicial Conference adopted a Report on the Powers and Responsibilities of the Judicial Councils which detailed the back-

ground of § 332 and its legislative history and set forth certain conclusions, of which the second is especially relevant here:

"(2) The responsibility of the councils 'for the effective and expeditious administration of the business of the courts within its circuit' extends not merely to the business of the courts in its technical sense (judicial administration), such as the handling and dispatching of cases, but also to the business of the judiciary in its institutional sense (administration of justice), such as the avoiding of any stigma, disrepute, or other element of loss of public esteem and confidence in respect to the court system, from the actions of a judge or other person attached to the courts."

H.R.Doc. No. 201, *supra* at 8–9.

The report also concluded that § 332 was "adequate to enable the judicial councils, on proper exercise of their responsibilities, . . . to assist in achieving 'the effective and expeditious administration of the business of the courts.'" Id. at 9.

The Judicial Conference Report was printed in July, 1961, as House Document 201, 87th Congress, 1st Session, with a foreword in which Emanuel Celler, then Chairman of the Judiciary Committee, stated:

"Since I, at the time, was a member of the Committee on the Judiciary of the House, I know it was the intention of the Congress to charge the judicial councils of the circuits with the responsibility for doing all and whatever was necessary of an administrative character to maintain efficiency and public confidence in the administration of justice."

The Report also shows that it was the expectation of those judges who recommended placing responsibility in the circuit councils, and also of the Congress, that the councils, in exercising their powers under § 332, would in most cases be able to operate informally and without the need of transmitting and publishing written orders.

In my opinion, the circuit council had the power to require that any officer of a district court could continue to act as such officer only so long as his so acting did not raise any serious question of the fairness and impartiality of the consideration of the court's business. When Nolan's client filed a plan for reorganization it was immediately obvious to all concerned that Nolan could not continue to give any counsel regarding reorganization plans. Judge Shaw thought it was enough to announce that Nolan would not advise regarding that plan. Quite understandably the circuit council differed. Since the circuit council has the power to supervise the administration of the district courts, and has the responsibility to do so in a way designed to maintain public confidence in the administration of justice, its order must prevail. While the record is silent on what if any overtures were made to Judge Shaw before the matter was discussed at the February 10, 1972, meeting of the council, and during the interim before Chief Judge Seitz's letter of March 10, 1972, it seems altogether likely that attempts were made informally in order to secure Judge Shaw's compliance. When these informal approaches failed, the council had no choice but to direct compliance forthwith.

Having been advised of the order of the council by the proceedings before Judge Shaw which culminated in his order of May 2, 1972, Nolan's only recourse, other than to file a petition for mandamus in the Supreme Court, was to petition the council for reconsideration of its order.[3]

---

3. That Nolan was fully cognizant of his opportunity to petition the circuit council for reconsideration is evident from a reading of his petition to the Supreme Court for Writ of Prohibition and/or Mandamus, which states at page 21 that "Petitioner in this case does not know whether he is required to seek relief in the Court of Appeals . . . ., or before the Judicial Council."

The public and the bar demand of the federal judiciary and its officers adherence to the highest standards of conduct. *Cf.* ABA Code of Judicial Conduct, Canon 1 (1972).[4] Not only must matters be handled fairly and impartially by judges and officers of the courts, there must not even be the appearance of possible unfairness and partiality. *Cf.* ABA Code of Judicial Conduct, Canon 2 (1972); ABA Code of Professional Responsibility, Canon 9 (1969). See the Report of Proceedings before the Judicial Conference of the United States for October 31 and November 1, 1969, Annual Report of the Administrative Office of the United States Courts, 1969, pp. 50–52, and the Report of Proceedings before the Judicial Conference of the United States for March 16, 1970, Annual Report of the Administrative Office of the United States Courts, 1970, pp. 6–9, particularly the statement required to be filed by judges every six months listing participation in any cases where the judge knew at the time that he or any member of his immediate family in his household had any financial interest in any of the parties. The result is that a federal judge almost always disqualifies himself if he, or any member of his immediate family, has any interest whatever, no matter how small, in any of the parties involved in litigation before the court. See also 28 U.S.C. § 455.

There is no reason why similarly high standards should not be required of the officers of the federal courts, including counsel to a trustee in a bankruptcy reorganization. Canon 9 of the American Bar Association Code of Professional Responsibility states: "A Lawyer Should Avoid Even the Appearance of Professional Impropriety." Accompanying Canon 9 is Ethical Consideration 9–6[5] which states: "Every lawyer owes a solemn duty to uphold the integrity and honor of his profession; to encourage respect for the law and for the courts and judges thereof; . . . to conduct himself so as to reflect credit on the legal profession and to inspire the confidence, respect, and trust of his clients and of the public; and *to strive to avoid not only professional impropriety but also the appearance of impropriety.*" [Emphasis added]

Canon 5 of the Code states: "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." Ethical Consideration 5–15 amplifies this general language: "If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues employment. *He should resolve all doubts against the propriety of the representation.*" [Emphasis added]

The spirit of the Bankruptcy Act is entirely consistent with these policies. For example, section 157 provides generally that before an attorney can be appointed to represent a trustee he must qualify as a disinterested person. 11 U.S.C. § 556. Section 158 defines interested persons to include those who "for any reason [possess] an interest materially adverse to the interests of any class of creditors or stockholders." 11 U.S.C. § 558. One commentator has noted that "this [clause] has rightly been termed a 'catch-all clause,' and it seems broad enough to include anyone who in the slightest degree might have some interest or relationship that would even faintly color the independent and impar-

---

4. On April 6, 1973, the Judicial Conference of the United States adopted the ABA Code of Judicial Conduct as the standard for federal judges with minor modifications not here relevant.

5. "The Ethical Considerations are aspirational in character and represent the ob-

jectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations." ABA Code of Professional Responsibility: Preamble.

tial attitude required by the Act." 6 Colliers on Bankruptcy ¶708(5), at 1186 (14th ed. 1972) (footnotes omitted). At the time that Judge Shaw removed him, Nolan clearly fell within the definition of interested persons contained in section 158. Furthermore, section 158 "provides a *minimum* standard for the guidance of the judge in his appointments and insures that persons employed as trustees and their attorneys in the conduct of Chapter X proceedings shall have that character of independence and disinterestedness which was considered one of the chief aims of Chapter X"; and even if a person's associations do not come within the literal purview of section 158, a judge can reject him if his associations are "prejudicial to disinterestedness." 6 Colliers on Bankruptcy ¶7.08 [1], at 1180–81 (14th ed. 1972) (emphasis added) (footnotes omitted). Thus, it is apparent that the same concerns which are embodied in the Code of Professional Responsibility are also present in the statutory scheme governing corporate reorganizations under the Bankruptcy laws.

However, it is no answer to say, as the majority does, that perhaps Nolan could have been appointed attorney for the trustee by the district court in any event because § 157 contains a proviso which allows the appointment of an interested person for purposes other than "to represent a trustee in conducting the proceeding under this chapter." 11 U. S.C. § 557. This proviso does not detract from the validity of the circuit council's action; it provides at most a very limited exception to the statute's general prohibition against the employment of interested persons in reorganization proceedings. Moreover, what is at issue here is not the power of the district court in the exercise of its normal discretion concerning the everyday administration of the bankruptcy courts, but the much more far-reaching authority of the circuit council to take corrective action in affairs of judicial administration when it becomes aware of a conflict of interest which presents an appearance of impropriety to the public and which may undermine the public's confidence in the judiciary.

When several of the circuit judges advised the circuit council that one of Nolan's clients was proposing a plan for reorganization and that Nolan would still continue to act as counsel, although he was not to be heard from regarding that plan, the council unanimously concluded that Nolan's continuing as counsel would be highly improper as it would give the appearance of a conflict of interest which could be avoided only by his retirement.

Apparently, informal overtures to Judge Shaw, if any, were unsuccessful. Both the judge and Mr. Nolan thought that Nolan could continue as counsel as to all other matters as long as the creditors were informed that he was not advising regarding the Schiavone plan. The circuit judges were already aware that on two occasions creditors had objected that the district judge had been over-generous to the trustee and his counsel regarding fees. Nolan's continuance as counsel on any basis while the Schiavone plan was being considered would obviously raise very serious questions about possible conflict of interest and might lead to further litigation and more appeals.

The circuit judges were concerned that public confidence in the administration of the bankrupt estate would be shaken unless measures were speedily taken; quite properly they acted without delay. How can we or anyone else question that the Council was well advised and in the best position to estimate the effect which Nolan's continuance would have on public confidence in the administration of justice in the reorganization proceeding? The adoption of a rule which would settle the Nolan matter and at the same time guide the district courts against a similar situation in any other bankruptcy proceedings was entirely proper. It avoided any judgment which would reflect adversely on Nolan's acts while counsel; it merely announced a principle which

must be applied to all such situations and as such it was circulated in April 1972 to all the chief district judges of the Third Circuit.[6]

The relevant facts were not in dispute; it was the measures required to maintain public confidence which were contested. The council concluded, with good reason, that the impasse could be resolved by the order which it adopted. I do not see how there can be any question that the order of February 10 was an order which was necessary for the effective administration of the business of the district courts in the Third Circuit. In any event this order was well within the statutory powers of the circuit council.

After being advised of the resolution Nolan could have petitioned the council for reconsideration of its order. There is no reason to believe that he would not have been heard had he come forward with any facts or arguments not already known to and weighed by the council. Failing this, with such respite as the council would have granted to review the matter, Nolan as an officer of the court was bound promptly to carry into effect the order of the council, just as Judge Shaw was required by the express language of § 332 promptly to comply with the order of the council. Nolan had no greater standing than the district judge; his duty to comply promptly was just as clear.

Thus I can see no due process requirement that Nolan be given further notice and a hearing. Nolan asked for no more process or hearing until Judge Shaw finally acted on May 2, 1972. On that same day Nolan filed his action for declaratory judgment in the district court.

In the light of the legislative history of § 332 and its purpose, as commonly understood, and its subsequent use by the circuit councils, the exercise of council powers is an act of judicial administration. The power is given to the councils as a necessary means of supervising the administration of justice in the federal courts of each circuit. The councils must determine to what extent consultations, notice and hearings are necessary depending on the circumstances of each situation. What is thought necessary or desirable will vary with each occasion. Where it is thought that rules are needed to speed court business and that those most concerned can be helpful, and should be heard to suggest and discuss proposed rules, the council can provide for consultation and a period of time before the proposed rules become effective. This was done by the Judicial Council of the Second Circuit in the course of promulgating Rules Regarding Prompt Disposition of Criminal Cases, which went into effect July 5, 1971, after ten months of discussions commencing in September, 1970. See United States ex rel. Frizer, 437 F.2d 1312, 1317 and 28 U.S. C.A. (Supp.1972). These Rules preceded the adoption of F.R.Crim.P. 50(b).

But where the principle is clear, the facts are undisputed, and the need is immediate, the council may act quickly and require immediate compliance. That is this case. Were the requirements otherwise, so that litigation might easily frustrate and delay salutary action, much of the power and the ability of the councils to function would be rendered uncertain and ineffective. It is sufficient safeguard that any action of a circuit council may be brought to the attention of the Supreme Court for correction by mandamus. See opinion of Mr. Justice Harlan in Chandler v. Judicial Council of the Tenth Circuit, 398 U.S. 74, 89–129, 90 S.Ct. 1648, 26 L.Ed.2d 100.

For the reasons above stated, I would affirm Judge Shaw's order of May 2, 1972, and I would affirm Judge Thomsen's order. Were I to reach the merits, I would hold that the order of the circuit council and the manner of its being effected were altogether proper.

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, ROSENN and WEIS, Circuit Judges.

---

6. See Plaintiff's Complaint, Appendix to Appellant's Brief at 55a–56a.

## OPINION SUR PETITION FOR REHEARING IN BANC

SEITZ, Chief Judge.

Petitions for rehearing have been filed by the intervenor, Judicial Council and by the Union Bank. Under Third Circuit procedures, these petitions are appropriately considered both by the panel making the original decision and by the judges constituting the court in banc. "Preparation and Circulation of Opinions and Procedure For Hearing and Rehearing In Banc (Third Circuit)," Par. 9(a) and (b).

The petitions were therefore referred to the panel, and its majority has denied rehearing before the panel. Since the panel consisted of senior circuit judges from other circuits, they, of course, are not eligible to vote on the petition insofar as it seeks rehearing in banc. 28 U.S.C. § 46(c) (1971). The petitions have now been circulated to the six active judges [1] of the court for in banc consideration.

We are confronted at the outset with our previous decision to recuse ourselves in this litigation. We are now constrained to consider whether, in light of the language in footnote 1 of Judge Lumbard's dissent and the issues of exceptional importance presented in the petition, F.R.App.P. 35(a), we should continue to recuse ourselves in the processing of the petitions insofar as they seek in banc action.

Some of the important issues are:

1. Does either the District Court or the Court of Appeals have jurisdiction to invalidate action taken by the Council under its rule making power?

2. Assuming jurisdiction, was it permissible for the Court of Appeals to make a judgment in this case, contrary to the Council's, that there was no need for a Council Rule, and invalidate it on that ground?

3. Assuming, contrary to the panel's position, that the Rule is valid, is it invalid as applied to Nolan?

We believe the issues presented warrant rehearing in banc. Nevertheless, we have decided that we should adhere to our previous decision to recuse ourselves. We do so because we originally recused ourselves solely for appearance sake, and we would not want it to appear that we have changed our position as a result of the opinion of the panel majority. Moreover, we are hopeful that the Supreme Court will see fit to review this important matter, especially since we are impelled to recuse ourselves from sitting in banc on these petitions. If it should decide that it was error for us to recuse ourselves solely because we were members of the Council, we would of course, on remand act on the petitions insofar as they seek to have the court convened in banc.

The participating members of the court have authorized me to enter orders denying the petitions for rehearing in banc with recitals showing that they are being denied since such judges have recused themselves from voting on the petitions solely because of their Council membership.

---

[1]. Two active judges have disqualified themselves throughout for a reason other than their membership on the Council.